HOWARD J. GREENFIELD and PEARL D. GREENFIELD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Greenfield v. Commissioner
Docket No. 5128-80.
United States Tax Court
T.C. Memo 1982-617; 1982 Tax Ct. Memo LEXIS 131; 44 T.C.M. (CCH) 1487; T.C.M. (RIA) 82617; October 21, 1982. Michael Schlesinger, for the petitioners. Michael N. Balsamo, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Chief Judge: Respondent determined a deficiency of $92,639 in petitioners' 1975 Federal income tax. The issue for our determination are: (1) whether petitioners are entitled to use the installment method to report their gain on the sale of stock; if not, (2) whether the sale qualifies as an open transaction. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Howard J. Greenfield *132 and Pearl D. Greenfield, resided in White Plains, New York, at the time they filed the petition in the instant case. On September 16, 1975, petitioners entered into an agreement with Ribon Industries, Inc. (Ribon or the corporation) whereby petitioners agreed to sell 100 shares of Ribon stock to the corporation. The agreement provided, in relevant part, as follows: 2. The purchase price is $400,000.00, $100,000.00 of which has been paid simultaneously with the execution of this agreement, and the balance of which the Corporation shall pay to the Sellers * * * in monthly installments of $5,000.00 each, together with interest at the rate of 8 1/2%, beginning on the 1st day of October, 1975 * * *. 12. The Corporation hereby agrees to loan to the Sellers the sum of Sixty Thousand ($60,000.00) Dollars on October 2, 1975, on a promissory note for said sum payable at the rate of Five Thousand ($5,000.00) Dollars per month beginning October 2, 1975, with interest at 8 1/2%, to be secured by the first notes coming due to the Sellers, including the note of October 1, 1975, which notes shall be delivered to the Corporation upon the making of said loan, which shall be repaid by the *133 cancellation of said notes on their due dates. The agreement also provided that the 100 shares of stock were to be held in escrow until Ribon's note was paid in full. If Ribon defaulted on its obligation, petitioners could cause the escrow agent to sell the stock. Petitioners' basis in the stock was $43,678. On their 1975 return, petitioners used the installment method to report the gain on the sale of the Ribon stock. At the time petitioners entered into the agreement with Ribon, Harry Ayre (Mr. Ayre) was the president and chief executive officer of Ribon. On August 7, 1975, Mr. Ayre was convicted of bribery of a U.S. Government employee and was sentenced to 30 days' imprisonment and fined $3,500. On July 10, 1978, he was found guilty of income tax evasion and was sentenced to two years imprisonment and fined $30,000. OPINION We must determine: (1) if petitioners are entitled to report the gain on the sale of their Ribon stock on the installment method; (2) if petitioner may not utilize the installment method, whether the sale qualifies as an open transaction so that petitioners need recognize income only to the extent to which Ribon makes payment on its notes. *134 Section 453(b)[1] provides that income from a casual sale of personal property for a price exceeding $1,000 may be reported on the installment method if, in the taxable year of the sale, either there are no payments or the payments (excluding evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. The parties' only disagreement is whether petitioners received in excess of 30 percent of the selling price in the year of sale, i.e., 1975. Respondent has determined that the $60,000 received by petitioners from Ribon in October 1975 did not represent a bona fide loan but rather constituted an additional year-of-sale payment. Under this theory, petitioners received $160,000, i.e., 40 percent of the selling price, in 1975 and, thus, do not qualify for the installment method. As might be expected, petitioners argue that only $100,000 was received as payment from Ribon in 1975 and that the $60,000 was a loan which should be ignored for purposes of the 30-percent limitation. *135 Admittedly, the agreement between petitioner and Ribon recites that the $60,000 is a loan. However, the label attached by the parties to the transaction is not determinative of this issue but is only one factor to be considered. See., e.g., Blue Flame Gas Co. v. Commissioner,54 T.C. 584, 595 (1970). While a taxpayer has the right to structure the transaction so that he receives less than 30 percent of the proceeds in the initial year, the formal documentation of the sale does not always control its taxation. Rickey v. Commissioner,54 T.C. 680, 694-695 (1970), affd. 502 F.2d 748 (9th Cir. 1974). The question of whether purported indebtedness is a loan for tax purposes depends upon the particular facts and circumstances of each case, with petitioners bearing the burden of proof. See Mennuto v. Commissioner,56 T.C. 910, 916-917 (1971); Rule 142(a). The totality of the factors present in this case convinces us that petitioners have not satisfied their burden of proving that the $60,000 was a loan, rather than a partial *136 payment of the sales price. Significant to our determination is the fact that petitioners and Ribon structured the transaction so that the "loan" was "repaid" by mere bookkeeping entries. The interest rate and monthly payment on Ribon's and petitioners' notes were identical. The agreement itself provided that petitioners' note would be "repaid by the cancellation of [Ribon's] notes on their due dates." Petitioners received the immediate and unrestricted use of funds which, due to the structure of the transaction, would never have to be repaid. The fact that no repayment would ultimately be necessary, due to the contemporaneous obligations incurred by Ribon, severely undercuts petitioners' characterization of the cash receipt as a loan. See Blue Flame Gas Co. v. Commissioner,supra at 595-596; Big "D" Development Corp. v. Commissioner,T.C. Memo. 1971-148, affd. per curiam 453 F.2d 1365 (5th Cir. 1972). See also Rickey v. Commissioner,502 F.2d 748, 753 (9th Cir. 1974), affg. 54 T.C. 680 (1970). The interdependence of the sale and the "loan" also indicates that the cash received was, in *137 fact, sales proceeds. See United States v. Williams,395 F.2d 508 (5th Cir. 1968). There is no evidence indicating that Ribon would have considered loaning any money to petitioners apart from the sales transaction. Additionally, no significant amount of time elapsed between petitioners' agreement to sell the stock and Ribon's decision to loan petitioners the cash such as might indicate that the two events were independent. [2]
Our conclusion in this case is supported by the decision of this Court in Hammond v. Commissioner,1 T.C. 198 (1942). There the taxpayer sold shares of stock for a total price of $965,000, receiving in the year of sale cash of $74,000 from the purchaser. In addition, he received from a creditor, who was also a party *138 to the sales agreement, cash in the amount of $280,000 and the cancellation of a prior indebtedness of $150,000, for which the taxpayer gave the creditor his notes for $430,000 payable only from the payments to be made by the purchaser. Under these facts, we held that the taxpayer received in excess of 30 percent of the sale proceeds in the year of sale and was not entitled to use the installment method. Because the taxpayer's notes were payable only out of the payments to be made by the purchaser, we rejected his contention that a bona fide debt existed in the amount of $430,000; the taxpayer's "so-called liability was a liability in name only." 1 T.C. at 206. We think the same is true in the instant case. [3]
*139 Petitioners assert that the cash received from Ribon was a bona fide loan because, if Ribon went bankrupt, they would be liable to Ribon's creditors for the unpaid balance of the loan. Assuming for the moment that petitioners are correct about their liability to Ribon's creditors, this is only one consideration which must be weighed against the other factors indicating that the cash was a payment of the sales proceeds. The record contains no evidence as to Ribon's assets or liabilities; there is no indication that Ribon was even considering filing for bankruptcy or that it was having problems meeting its obligations. Under these circumstances, we do not attach much significance to what, on the basis of this record, is a purely speculative possibility that Ribon might go bankrupt. The fact remains that pettioners received unrestricted use of $60,000 and there was little, if any, likelihood that they would have to part with any portion of that cash to Ribon's creditors. Furthermore, it appears to us that, if Ribon were to file for bankruptcy, petitioners could offset their "debt" against the money owed to them by Ribon. *140 Section 553 of the Bankruptcy Code provides, in part, that it "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case * * * against a claim of such creditor against the debtor that arose before the commencement of the case * * *." 11 U.S.C. sec. 553.[4] Although section 553 provides some exceptions to this right of setoff, petitioner has presented no probative evidence which indicates that these exceptions would apply to petitioners were Ribon to go bankrupt. See Big "D" Development Corp. v. Commissioner,supra.See also, United States v. Ingalls,399 F.2d 143, 145-146 (5th Cir. 1968). *141 Petitioners rely on the Sixth Circuit's opinion in Estate of Lipman v. United States,376 F.2d 455 (6th Cir. 1967), to support their contention that the $60,000 represents a bona fide loan. For the reasons set forth in Big "D" Development Corp. v. Commissioner,supra, namely, the tripartite arrangement and the presence of a bargained-for covenant not to compete, Estate of Lipman is inapposite to the present case. [5]
Petitioners' reliance on Ludlow v. Commissioner,36 T.C. 102 (1961), is similarly misplaced. In Ludlow, we held that, where the sales contract contained an erroneous *142 computation of the year-of-sale payments and the seller returned the excess receipts, the amount erroneously received was not an initial-year payment. In the instant case, it is clear that the agreement accurately reflected Ribon's and petitioners' understanding concerning the amount of money petitioners would and did receive in 1975. Pettioners' second argument is that they are entitled to treat the sale of stock as an "open transaction" and, accordingly, recognize no income until payments are received from Ribon. Initially, we note that this case does not involve a situation where the amount of the obligation cannot be calculated with any degree of certainty or where the taxpayer's right to receive payment of the obligation is conditional. In such situations, the courts have usually held that the open transaction doctrine is applicable. See, e.g., Burnet v. Logan,283 U.S. 404 (1931). In the instant case, the amount which Ribon was required to pay petitioners was fixed, the obligation to pay was not subject to a prior condition, and that obligation was represented by negotiable notes. We have held that *143 the open-transaction doctrine also is applicable where the notes held by the taxpayer are "speculative." See, e.g., Underhill v. Commissioner,45 T.C. 489 (1966). Petitioners, however, have not satisfied their heavy burden of proving (see Underhill v. Commissioner,supra at 493) that Ribon's notes were speculative. One factor which we consider in determining whether the notes were "speculative" is their marketability, which involves the subsidiary consideration of negotiability. Underhill v. Commissioner,supra at 494. Mr. Greenfield and his accountant testified that two banks refused to discount the notes. However, there is no evidence in respect of on what terms Mr. Greenfield requested that the notes be discounted or why the two banks refused. Under these circumstances, petitioners have not met their burden of proving that the notes were not marketable. The stock sold to Ribon was placed in escrow as security for Ribon's notes. This factor tends to undercut petitioners' argument that it was unlikely that they would receive payment on the notes. See Underhill v. Commissioner,supra at 494. *144 Furthermore, petitioners failed to offer any evidence that Ribon was financially unable to meet its obligations. In sum, petitioners have not carried their heavy burden of proving that Ribon's notes were speculative obligations. Accordingly, petitioners may not report the sale of this stock to Ribon as an open transaction. Petitioners' attempt to utilize Mr. Ayre's conviction and the impact of the fines that he was called upon to pay to avoid the consequences of the transaction as structured is totally without merit. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and effect during the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners argue that they and Ribon had some sort of initial oral agreement concerning the stock sale which did not include the "loan" provision and that it was 10 days later that petitioners realized that they needed the $60,000 cash. Even if we accept such testimony as true, the lapse of 10 days is not sufficient to convince us that the "loan" provision was independent of the sales transaction.↩
3. in Hammond v. Commissioner,1 T.C. 198, 204 (1942), the Court made the following comment: It may be supposed that if A sold property to B for $965,000, the latter paying $74,000 in cash and agreeing to pay the balance in stated installments during subsequent years, and if at the same time B "loaned" A an additional amount of $430,000, taking A's notes to mature coincidentally with installments due him, the understanding being that the notes would never be enforced against A, but that as installments and notes matured, the notes would simply be destroyed, a court would have little hesitancy in ignoring the idle form that the transaction took and in concluding that A had in fact received as his own the sum of $504,000. "A given result at the end of a straight path is not made a different result because reached by following a devious path." Minnesota Tea Co. v. Helvering,302 U.S. 609↩.
4. As explained in In Re Applied Logic Corp.,576 F.2d 952, 957 (2d Cir. 1978), the right of setoff "allows a creditor who owes the estate the same amount that it owes him to come out whole * * *." The Second Circuit has repeatedly favored the allowance of setoffs. Bohack Corp. v. Borden, Inc.,599 F.2d 1160, 1165↩ (2d Cir. 1979).
5. Nor does Rev. Rul. 234, 1953-2 C.B. 29↩, support petitioners' position. In that revenue ruling, it was determined that an advance which was made by the purchaser prior to the execution of the sales agreement and which was to be repaid by the seller prior to the actual sale was not an initial-year payment but rather a loan. The facts on which the revenue ruling is based are different from those involved in the present case.